BEFORE THE UNITED STATES JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION

| | |
|---|---|
| **In re: Consumer Vehicle Driving Data Tracking Litigation** | MDL No. 3115 |

### KIA AMERICA, INC.'S INTERESTED PARTY RESPONSE IN OPPOSITION TO JARIYA THONGSAWANG'S MOTION FOR TRANSFER AND CENTRALIZATION PURSUANT TO 28 U.S.C. § 1407

The Motion of Plaintiff Jariya Thongsawang for Transfer and Centralization Pursuant to 28 U.S.C. § 1407 should be denied insofar as it seeks to include *Vaughn v. Kia America, Inc.*, No. 24-cv-01473 (E.D. Pa.), in this proposed MDL. Of the nineteen cases noticed for potential centralization, *Vaughn* is the ***only*** one in which Kia America, Inc. ("Kia") is named as a defendant.[1] In ***every*** other case, the plaintiffs name instead Kia's competitor, General Motors LLC ("GM"). Whereas *Vaughn* is the singular case that concerns a customer who purchased a Kia vehicle, equipped with Kia technology, pursuant to Kia's terms and conditions, alleging separate representations and disclosures by Kia, each of the other eighteen cases involves GM customers, GM vehicles, GM's OnStar technology, and GM's disclosures and terms. Adding *Vaughn* to any centralized proceeding would thus result in significant inefficiencies for all parties involved and any transferee court, stemming from a need for disparate discovery, motions practice, and protections regarding trade secrets and confidential business information. Kia, in particular, will suffer if forced to litigate a complex coordinated or consolidated proceeding where it otherwise would face a single plaintiff in a single action.[2] For these reasons and the reasons that follow, Kia

---

[1] Kia Corporation is also named as a defendant in *Vaughn*, but has not been served.

[2] As discussed in further detail below, Ms. Vaughn is, for example, subject to an arbitration agreement, one of a number of factors that renders transfer and centralization inappropriate. Kia reserves all rights and defenses, including its contractual defenses and its right to compel

1

respectfully requests that the Judicial Panel on Multidistrict Litigation (the "Panel") deny Ms. Thongsawang's Motion as to *Vaughn*.

I.  **BACKGROUND**

Ms. Thongsawang filed her Motion on April 5, 2024.  *See* ECF No. 1.  To date, nineteen[3] cases have been noticed for potential centralization.  *See* ECF Nos. 12, 21, 35, 36, 41, 58, 65, 68.  Of the nineteen cases, the plaintiffs in eighteen name GM as a defendant; most of those plaintiffs also name OnStar, LLC ("OnStar") and LexisNexis Risk Solutions Inc. ("LexisNexis") as a co-defendants.  *See* ECF Nos. 1-2, 12-1, 21-1, 35-1, 36-1, 41-1, 58-1, 65-1, 68-1.  In the ninteenth case—*Vaughn*—only Kia is named a defendant alongside LexisNexis.  *See* ECF No. 68-3.

A.  **The Eighteen Cases Against GM**

The Complaint in *Reed v. General Motors LLC*, No. 24-cv-10804 (E.D. Mich.), is illustrative of the eighteen GM cases.  Plaintiff Larry Reed alleges that in late 2022 he leased a new Chevrolet Silverado equipped with OnStar technology.  ECF No. 1-7 ¶¶ 38–39.  According to Mr. Reed, GM launched OnStar in 1996 and the system evolved over time—adding features like GPS location and "remote diagnostic capabilities."  *Id.* ¶¶ 16–17.  The OnStar technology and related GM mobile applications like "myChevrolet" eventually allowed GM and OnStar to collect "driving telematics data"—such as "acceleration events, hard brake events, [and] high speed events."  *Id.* ¶¶ 24, 42.  Mr. Reed alleges that GM shares or sells this data to third parties including LexisNexis.  *See id.* ¶¶ 6, 33.

---

arbitration, enforce applicable class-action waivers, and otherwise contest the individual and class allegations in *Vaughn*.

[3] This figure excludes *Ulrich v. General Motors, LLC*, No. 24-cv-11007 (E.D. Mich.), which was apparently noticed in error.  *See* ECF No. 61; ECF No. 75 at 3 n.2 (conceding that *Ulrich* is not a related case).

A year after he started using OnStar in his Silverado, Mr. Reed was allegedly notified of a "sharp increase" to his insurance premiums. *Id.* ¶ 41. He claims the increase was due to "driving events" collected through OnStar and reported to insurers by LexisNexis. *Id.* ¶¶ 41–42. Mr. Reed maintains that he was unaware that GM and OnStar would track and disclose his driving. Rather, it was his "understanding that GM and OnStar would not share this type of information without his express consent or authorization," which he says he never provided. *Id.* ¶¶ 40, 45. For support, Mr. Reed details GM's User Terms for Application Services, OnStar's User Terms, and corresponding GM and OnStar privacy statements, alleging that "the *only* reference to sharing data with third parties" like LexisNexis and insurers is this:

> [OnStar] may also share data with third parties . . . where you have elected to receive a service from them and/or authorized them to request data from GM (for example, financial organizations who offer financing for the purchase or lease of GM vehicles or usage based insurance providers).

*Id.* ¶ 31. Arguing that this language "provides no basis for the conduct at issue in the instant suit," Mr. Reed thus asserts claims against GM an OnStar for common-law invasion of privacy and violations of Michigan's Consumer Protection Act. *Id.* ¶¶ 66–72, 93–102.

In each of the other GM cases, plaintiffs make allegations regarding a GM vehicle equipped with OnStar technology, citing GM representations or disclosures regarding data privacy. Ms. Thongsawang, for instance, alleges that she purchased a 2021 Chevrolet equipped with OnStar, but that she was never "appropriately alerted that GM would collect and share her . . . data." ECF No. 1-8 ¶ 5. She points to OnStar's website to support her expectation that it would share driver data with third parties only with express consent that she never provided:

3

> How does OnStar protect Members' personally identifiable information from being shared?
>
> OnStar takes the security of its Members' data very seriously. We use technical, administrative and physical safeguards designed to help protect Members' information from loss, misuse and unauthorized access, disclosure, alteration, destruction or theft. OnStar doesn't share personally identifiable information with an insurance company without your express consent.

*Id.* ¶ 21.

### B. The Single Case Against Kia

*Vaughn* proceeds on very different allegations. Plaintiff Jaquelyn Vaughn drives a 2024 Kia Seltos, not a GM vehicle. ECF No. 68-3 ¶ 16. And Ms. Vaughn's Kia is not equipped with OnStar technology. Instead, it is allegedly "capable of supporting [Kia's own] driver tracking software" such as "Kia Connect," which "allows Kia to record, store, and transmit data about . . . driver behavior." *Id.* ¶¶ 16, 18. Ms. Vaughn alleges that Kia vehicles began to have these capabilities only in 2018, well after GM first introduced its OnStar service. *Id.* ¶ 17. She maintains that "[n]othing in Kia's disclosures mentions that [Kia] will furnish or sell drivers' driving performance data to third parties." *Id.* ¶ 22. Despite this, Ms. Vaughn alleges, Kia disseminated this data to third parties, including through LexisNexis. *Id.* ¶¶ 4–6. Ms. Vaughn thus claims that she has suffered an invasion of privacy and economic harm warranting relief under the federal Fair Credit Reporting Act, over 50 state or territorial consumer protection statutes, and common law theories of tortious interference, invasion of privacy, and unjust enrichment. *Id.* ¶¶ 49–86. Ms. Vaughn seeks to represent three classes of "[a]ll drivers whose **Kia**-manufactured vehicles [are] capable of supporting driver behavior tracking software" and whose data was recorded and/or furnished to third parties. *Id.* ¶ 39 (emphasis added).

### C. Procedural Posture

Despite the fact that Ms. Vaughn filed her complaint in the U.S. District Court for the Eastern District of Pennsylvania on April 9, 2024, Ms. Thongsawang waited until

4

April 24, 2024—two days before the deadline for responses to her Motion—to notice *Vaughn* as part of this proceeding. *See* ECF No. 41. Kia did not receive a copy of the notice until April 30, 2024, and has, therefore, filed a contemporaneous motion to extend its deadline to file this Response in advance of oral argument set for May 30. ECF No. 7.

Several developments have occurred since Ms. Thongsawang filed her Motion. On the one hand, despite the differences plain on the face of the pleadings between *Vaughn* and the other eighteen cases under consideration, Ms. Vaughn has filed a brief response in support of centralization, stating—without any citations or support at all—that "[t]here is no question all pending cases implicate common facts and legal issues." ECF No. 48 at 1. She cites nothing and articulates no basis for her unsupported assertion of "common facts and legal issues." *See id.* On the other hand, several parties to the underlying cases have objected to *Vaughn*'s inclusion in the proposed MDL. Two GM plaintiffs, for example, have filed responses asking the Panel to exclude *Vaughn* because "*Vaughn* arises out of a wholly distinct set of facts involving different technology and a different defendant." ECF No. 49 at 3; *see also* ECF No. 44 at 5 n.3 (arguing that *Vaughn* "contains wholly distinct facts and allegations against a separate car manufacturer with an entirely different system of tracking driver behavior than the OnStar system, which was utilized by [GM]"). GM has likewise objected to *Vaughn*'s inclusion in any centralized proceeding and further objects to the inclusion of "cases against other manufacturers that are competitors of GM," given that "[s]uch cases would be based on those manufacturers' separate practices and policies using their own proprietary vehicle technologies." ECF No. 57 at 2 n.2.[4]

---

[4] LexisNexis does not take a position on *Vaughn*'s inclusion, stating only, "Whether *Vaughn* should be consolidated is an issue that needs to be addressed." ECF No. 50 at 1 n.2.

5

## II.    ARGUMENT

### A.   The Panel Should Deny Ms. Thongsawang's Motion as to *Vaughn*

Adding *Vaughn*—a case about Kia customers, Kia cars, Kia technology, Kia agreements, and Kia disclosures—to a consolidated or coordinated proceeding with eighteen other cases about GM and OnStar is contrary to § 1407 and this Panel's precedent.  Consolidation or coordination is appropriate only as a "last solution," where there are "actions involving one or more common questions of fact pending in different districts" and the Panel determines that "transfers … will be for the convenience of parties and witnesses and will promote the just and efficient conduct of such actions."  28 U.S.C. § 1407(a); *In re GEICO Customer Data Sec. Breach Litig.*, 568 F. Supp. 3d 1406, 1407 (J.P.M.L. 2021).  The movant has the burden of persuasion on each of these related factors, which are inapplicable to the *Vaughn* case here.  *See In re: Best Buy Co., Inc., California Song-Beverly Credit Card Act Litig.*, 804 F. Supp. 2d 1376, 1379 (J.P.M.L. 2011) (movant bears the "burden of demonstrating the need for centralization").

To start, facts unique to each carmaker defendant would dominate any centralized proceeding, including but not limited to (i) the technology used to track driver data; (ii) the vehicles equipped with this technology; (iii) the defendant's representations and disclosures about data tracking and privacy; (iv) the manner by which a plaintiff did or did not authorize the defendant to track and share driver data; (v) the nature of the agreements and relationship between the defendant carmakers and LexisNexis; and (vi) the manner and extent to which the relevant carmaker shared driver data with LexisNexis or other third parties.  Each of these issues differs depending on whether Kia or GM is defending.  *Vaughn*, for instance, involves a 2024 Kia Seltos "capable of supporting" Kia's "driver tracking software," ECF No. 68-3 ¶ 16, while the other eighteen cases involve GM vehicles equipped with OnStar technology, *see, e.g.*, ECF No. 1-8 ¶ 5.  Similarly, *Vaughn* relies on the alleged absence in **Kia's** disclosures of any mention that it would provide

6

driver data to third parties, ECF No. 68-3 ¶ 22, while the other eighteen cases involve alleged misrepresentations or omissions in *GM's* and *OnStar's* terms, conditions, and disclosures, ECF No. 1-7 ¶¶ 27–37.  Even the facts concerning LexisNexis as a common defendant will be carmaker-specific, with the claims implicating questions about the distinct relationships between LexisNexis and each carmaker and the distinct manner and extent to which each carmaker shared driver data with LexisNexis or other third parties.

In light of this, centralizing *Vaughn* with the GM cases would needlessly complicate the proceedings, resulting in inconvenience and inefficiencies for all parties and the transferee court.  Discovery, for instance, is "almost certain to be defendant-specific," focused on Kia's and GM's unique technologies, development over time, and distinct representations and disclosures regarding driver data and dissemination.  *In re Proton-Pump Inhibitor Prod. Liab. Litig.*, 273 F. Supp. 3d 1360, 1362 (J.P.M.L. 2017) (denying transfer motion where underlying products each "ha[d] a unique development, testing, and marketing history"); *In re: Auction Rate Sec. (ARS) Mktg. Litig.*, 581 F. Supp. 2d 1371, 1372 (J.P.M.L. 2008) (denying transfer and consolidation where "the actions involve[d] different representations made to each purchaser . . . which will necessarily vary from institution to institution").  These differences in the discoverable facts will in turn "result in . . . pretrial motions[] and class certification issues that are not shared across [defendants]," further counseling against centralization.  *In re Starbucks Corp. Mktg. & Sales Pracs. Litig.*, 222 F. Supp. 3d 1348, 1349 (J.P.M.L. 2016).  Put simply, consolidating or coordinating *Vaughn* with the GM cases would raise defendant-specific issues at every turn—issues that would far exceed any marginal efficiency resulting from any limited common facts.  *See In re Power Morcellator Prod. Liab. Litig.*, 140 F. Supp. 3d 1351, 1353 (J.P.M.L. 2015) (denying transfer and consolidation where "individual issues that result from the differences

among each defendant's power morcellator with respect to product design, development, testing, warnings, and marketing will predominate over the common issues"); *In re: Cordarone (Amiodarone Hydrochloride) Mktg., Sales Pracs. & Prod. Liab. Litig.*, 190 F. Supp. 3d 1346, 1347 (J.P.M.L. 2016) (denying transfer and consolidation where "[t]he variance in named defendants virtually ensures that a significant amount of the discovery will be defendant-specific, as do plaintiffs' allegations themselves").

While these issues are alone sufficient to deny the Motion as to *Vaughn*, three further considerations support *Vaughn*'s exclusion from the prospective MDL.

***First***, this Panel is rightfully "hesitant to centralize litigation against multiple, competing defendants which marketed, manufactured and sold similar products." *In re Proton-Pump Inhibitor*, 273 F. Supp. 3d at 1362 (internal quotation marks omitted). Adding competing defendants to a centralized proceeding raises two primary issues: (a) it "prolong[s] pretrial proceedings, because of, *inter alia*, the . . . need for separate discovery and motion tracks, as well as the need for additional bellwether trials"; and (b) it "complicate[s] case management due to the need to protect trade secret and confidential information." *Id.* (internal quotation marks omitted). These concerns apply here. Kia and GM are competitors in the U.S. automotive market, differently situated with respect to the key factual issues, and plaintiffs will doubtless seek in discovery protected information regarding, *inter alia*, their proprietary vehicle technologies. Any transferee court would need to navigate these issues, on top of the case-specific factual differences discussed above, rendering centralization even more unwieldy. *See id.*; *see also In re: Yellow Brass Plumbing Component Prod. Liab. Litig.*, 844 F. Supp. 2d 1377, 1378 (J.P.M.L. 2012) (declining to centralize cases involving competing defendants); *In re Power Morcellator*, 140 F. Supp. 3d at 1353 (same); *In re: Tropicana Orange Juice Mktg. & Sales Pracs. Litig.*, 867 F. Supp. 2d 1341,

1342 (J.P.M.L. 2012) (same).  Indeed, the outcome would be especially harsh for Kia—which is named in just one of the eighteen cases currently noticed for potential centralization.

*Second*, the claims in *Vaughn* are subject to an arbitration clause, the litigation of which would further complicate any centralized action.  *See In re: Yellow Brass Plumbing Component*, 844 F. Supp. 2d at 1379 (fact that "one of the actions [was] being arbitrated and others could proceed to arbitration" counseled against consolidation).  Ms. Vaughn's Kia Connect Terms of Service include an arbitration provision and class-action waiver that Kia will enforce.  While GM suggests an arbitration defense too, *see* ECF No. 57 at 1 n.1, the question of arbitration and class-action waivers necessarily implicates different facts concerning the language of the unique agreements and the circumstances surrounding the relevant plaintiffs' consent to arbitration.  No court should be acting on the *Vaughn* claims when they are, in fact, subject to arbitration and resolution in a totally separate forum.  *See* 9 U.S.C. §§ 2-4.

*Third*, there is no reason to think that measures short of centralization would be ineffective.  To the extent that there is any ultimate overlap in facts specific to LexisNexis, "[t]he parties can avail themselves of alternatives to Section 1407 transfer to minimize whatever possibilities there might be of duplicative discovery."  *In re: Shoulder Pain Pump-Chondrolysis Prod. Liab. Litig.*, 571 F. Supp. 2d 1367, 1368 (J.P.M.L. 2008).  Centralization is not the "last solution" available when the parties should be able work together informally on whatever overlapping discovery issues exist due to any common questions that may exist on the margin.  *In re GEICO Customer Data*, 568 F. Supp. 3d at 1407 (noting "voluntary cooperation" as a desirable alternative to consolidation).  Both Ms. Thongsawang and Ms. Vaughn ignore this viable alternative, despite the Panel's instruction to "address what steps [the parties] have taken to pursue alternatives to centralization."  ECF No. 4.  Their failure to address this issue at all concedes that alternatives to

centralization exist, and that Ms. Thongsawang and Ms. Vaughn seek to maximize the size of any MDL that is formed, without regard to the factors set out in § 1407.

### B.     The Arguments for Including *Vaughn* Are Unpersuasive

Neither Ms. Thongsawang's nor Ms. Vaughn's arguments for centralizing *Vaughn* into what would otherwise be a GM proceeding withstand scrutiny.

Ms. Thongsawang cannot fairly reframe the underlying cases as "litigation about data privacy, not automobile defects" and suggest only "[m]inor differences" in how the "auto manufacturers' telematics systems function." ECF No. 75 at 1, 3. This new reply argument ignores the myriad differences between competing carmakers' practices, policies, and procedures. For example, while Ms. Thongsawang's and Mr. Reed's claims turn on **GM's** and **OnStar's** terms, conditions, disclosures, and privacy statements, those facts are irrelevant to Ms. Vaughn, whose claims turn on allegations regarding **Kia's** disclosures. *Compare* ECF No. 1-7 ¶¶ 27–37; *with* ECF No. 68-3 ¶ 22. Indeed, Kia's own terms of use include prominent disclosures about Kia's dissemination of certain driver data to third parties with the consumer's consent—disclosures allegedly absent in the GM cases.

These are far from the only material distinctions. GM and Kia use different, proprietary technologies here—GM uses OnStar, a service it has provided since the late 1990s, while Kia uses more recently developed technology. Indeed, the challenged Kia services were not even available in Ms. Vaughn's 2024 Kia Seltos. And while LexisNexis is a common defendant in the noticed cases, its inclusion only raises further fact distinctions, such as the nature of its contracts with the relevant carmaker and how data may be shared between the specific carmaker and LexisNexis.[5]

---

[5] Reporting on driver data tracking suggests further factual distinctions that may arise after discovery. For instance, according to the *New York Times*, GM representatives have acknowledged that some drivers had their driving data tracked and shared despite their GM mobile application showing that they were not enrolled in driver data tracking—a factual issue that has no

In short, casting this action as "litigation about data privacy" does not remove the differences in the underlying cases, which vary depending on the carmaker.

Next, Ms. Thongsawang (joined by Ms. Vaughn) erroneously suggests that the prospect of further tag-along cases against other manufacturers supports consolidation. To start, the argument is a *non-sequitur* because "the mere possibility of future filings" does not factor into this Panel's "centralization calculus." *In re: Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prod. Liab. Litig.*, 959 F. Supp. 2d 1375, 1376 (J.P.M.L. 2013). Notably, however, the addition of further cases against further competitor carmakers would only compound the issues discussed above by adding more fact differences and difficulties in protecting competitors' confidential information. Ms. Thongsawang hand-waives the latter issue with the conclusory assertion that "[c]omprehensive discovery protective orders can address any trade secret concerns," ECF No. 75 at 5, but that argument misses the point. Centralizing competitors into a single proceeding will unnecessarily complicate the proceeding ***precisely because*** it would require, at a bare minimum, comprehensive protective orders regarding each defendants' protected information and careful monitoring by the transferee court. *In re Proton-Pump Inhibitor*, 273 F. Supp. 3d at 1362 (centralizing cases involving competitors is disfavored because doing so "would complicate case management due to the need to protect trade secret and confidential information"). Any hearings, arguments, and orders addressing technical or other proprietary issues would need to be separate to protect Kia trade secrets from disclosure to lawyers or parties in the GM cases. None of that would be necessary in a GM-only proceeding.

---

bearing on Kia-specific claims. *See* Kashmir Hill, *How G.M. Tricked Millions of Drivers Into Being Spied On (Including Me)*, New York Times (April 23, 2024), available at: https://www.nytimes.com/2024/04/23/technology/general-motors-spying-driver-data-consent.html.

Finally, the Panel decisions cited in support of establishing a multi-carmaker MDL are easily distinguishable.  Most of the decisions concern the centralization of cases involving alleged injuries purportedly caused by similarly formulated cosmetic or pharmaceutical products such that centralization would result in efficiencies in expert discovery and the litigation of complex (but uniformly applicable) issues of, for example, the "alleged biological mechanism of injury."  *In re Glucagon-Like Peptide-1 Receptor Agonists Prod. Liab. Litig.*, 2024 WL 436482, at *2 (J.P.M.L. Feb. 2, 2024).[6]  Here, by contrast, differences in the relevant carmakers' conduct cannot be reduced to some uniform core because the claims implicate dominant, defendant-specific questions regarding, at least:  the relevant vehicles and any tracking technologies; the applicable carmakers' terms, conditions, and privacy disclosures; the circumstances of the relevant plaintiffs' consent to information sharing; and the applicable carmakers' relationship with LexisNexis.

Likewise unavailing is Ms. Thongsawang's argument that "in the automobile context this Panel transferred and centralized *In re ZF-TRW Airbag Control Units Products Liability Litigation* . . . and *In re Takata Airbag Products Liability Litigation* . . . over similar objections from auto manufacturers."  ECF No. 75 at 4.  Not only is that statement demonstrably false as to *In re Takata*—where "[a]ll responding parties support[ed] centralization"—but both cases are distinguishable in material respects.  *In re: Takata Airbag Prod. Liab. Litig.*, 84 F. Supp. 3d 1371, 1372 (J.P.M.L. 2015).  First, both actions concerned defective airbags manufactured by third-parties that were also named as defendants, such that differences between defendant carmakers were of marginal significance; here, by contrast, the claims arise out of each defendant carmakers'

---

[6] *See also In re Hair Relaxer Mktg., Sales Pracs., & Prod. Liab. Litig.*, 655 F. Supp. 3d 1374, 1376 (U.S. Jud. Pan. Mult. Lit. 2023); *In re: AndroGel Prod. Liab. Litig.*, 24 F. Supp. 3d 1378, 1379 (U.S. Jud. Pan. Mult. Lit. 2014); *In re Valsartan Prod. Liab. Litig.*, 433 F. Supp. 3d 1349, 1352–53 (U.S. Jud. Pan. Mult. Lit. 2019).

unique technologies and conduct.  *See id.* at 1372; *In re ZF-TRW Airbag Control Units Prod. Liab. Litig.*, 410 F. Supp. 3d 1357, 1359 (J.P.M.L. 2019).  Second, in both cases, competing carmakers had been named as codefendants within underlying individual actions, such that "denying centralization would hardly alleviate any trade secret concerns" that ordinarily counsel against "industry-wide" MDLs.  *In re ZF-TRW*, 410 F. Supp. 3d at 1360; *see In re Takata*, MDL No. 2599, Dkt. No. 1-2 (Nov. 3, 2014) (Schedule of Related Actions).  In this proceeding, by contrast, a single competing carmaker—either GM or Kia—is named as defendant in each underlying case.

In short, adding Kia-specific claims to an otherwise GM-dominated proceeding would needlessly complicate what could otherwise be an effective consolidation, frustrating the purposes of § 1407.  The Panel, accordingly, should deny Ms. Thongsawang's Motion as to *Vaughn*—a case about different cars, different proprietary technologies, and different representations and disclosures than those at issue in the other noticed actions.  Any other outcome would unreasonably burden the transferee court and all parties, Kia most of all.

### III.  CONCLUSION

For the foregoing reasons, Kia America, Inc. respectfully requests that the Panel deny Jariya Thongsawang's Motion for Transfer and Centralization insofar as it applies to *Vaughn v. Kia America, Inc.*, No. 24-cv-1473 (E.D. Pa.).

| | |
|---|---|
| Dated: May 6, 2024 | <u>s/ Edward S. Chang</u><br>Edward S. Chang<br>echang@jonesday.com<br>**JONES DAY**<br>3161 Michelson Drive, Suite 800<br>Irvine, CA 92612.4408<br>Telephone: +1.949.851.3939<br>Facsimile: +1.949.553.7539<br><br>Rebekah B. Kcehowski<br>rbkcehowski@jonesday.com<br>**JONES DAY**<br>500 Grant Street, Suite 4500<br>Pittsburgh, PA  15219.2514<br>Telephone: +1.412.391.3939<br>Facsimile: +1.412.394.7959<br><br>*Attorneys for Kia America, Inc.* |